[No. 3258.]

## Walter H. Miles v. The State.

1. Charge of the Court — Practice in the Court of Appeals. — In a trial for murder the conviction was for that offense in the second degree, and therefore this court deems it unnecessary to revise the instructions given to the jury upon murder of the first degree and express malice.

2. Charge upon Murder of the Second Degree instructed the jury that "every rash and inconsiderate killing under some sudden impulse, wherein there is no sedate mind and formed design to kill, is murder in the second degree; the law implies the malice. Every voluntary killing of a human being is murder in the second degree, unless the circumstances attending it upon the one hand show express malice, which would then be murder in the first degree, or, upon the other, such as would reduce the offense to manslaughter, or would excuse or justify the homicide." *Held*, that the first clause of this charge is obviously and radically erroneous, because it is not true. The "sudden impulse" may have resulted from adequate cause, arousing such passion as rendered the homicidal act "rash and inconsiderate;" and then the homicide would not be murder of the second degree, but manslaughter. Nor was the error in the first clause of the instruction efficiently corrected by the second clause, inasmuch as the latter was not explained to the jury as a qualification or modification of the former, and may have been understood by the jury to apply to a homicide of a character different from that spoken of in the first clause.

3. Charge upon Manslaughter. — In a trial for murder it was in proof that the deceased, when shot by the defendant, had just ridden or was attempting to ride against the defendant, and there was evidence of provocation of defendant by the deceased upon occasions prior to that of the homicide. The charge to the jury upon the law of manslaughter restricted them to the consideration of such provocation as may have occurred upon the immediate occasion of the homicide, ignoring all provocation prior thereto. *Held*, erroneous. The jury, in considering of the sufficiency of the provocation, and on its effect upon the passions and mind of the defendant, should not have been so restricted by the charge, but should have been allowed to look to all the evidence germane to the issue.

4. THREATS AS JUSTIFICATION — CHARGE OF THE COURT.— To justify homicide superinduced by threats, it must be shown that at the time of the homicide the person killed, by some act then done, manifested an intention to execute the threats. After giving this principle in charge to the jury, the trial court gave them a further instruction by which, in effect, the act manifesting an intention to execute the threats was required to be an "effort or demonstration to execute such threats." *Held*, erroneous. See the opinion in elucidation of this ruling.

APPEAL from the District Court of Bastrop. Tried below before the Hon. L. W. Moore.

The indictment charged the appellant with the murder of Harry Taylor, in Bastrop county, Texas, on the 6th day of April, 1884. His trial resulted in his conviction of murder in the second degree, and his punishment was affixed at a term of twenty-five years in the penitentiary.

Doctor J. D. Oliver was the first witness for the State. He testified that he did not know the deceased personally, but was called to see him professionally about twilight on the day he was said to have been shot. He was then lying at his father's house, mortally wounded. The ball entered at the top of the *lumbra vertebra*, to the left of the spinal column, tearing off a part of the front of the spinal column, and passed out of the body close to and a little above the navel. The deceased, when shot, must have been lying down, or in a stooping position, as the ball ranged upwards. This wound undoubtedly caused the death of the deceased.

James Brooks was the next witness for the State. He testified that he was at the house of Doctor Taylor, the father of the deceased, when the deceased was shot. He heard the reports of firearms, and the mother of the deceased asked witness to go and see what the occasion of it was, saying that she supposed it was "Walter Miles trying to kill Harry." At first the witness refused to go, but Mrs. Taylor insisted, and finally witness left, going over to defendant's house. Witness first saw the defendant sitting on his horse with a Winchester in his hands. He asked who the witness was, and witness replied. Witness's horse frightened somewhat, and defendant made a movement as if to shoot witness. He said: "Take care, Jim, or I will kill you." Witness replied that he was not going to try to hurt him, and he then told witness to go and see Harry, and if he was not dead to see what he could do for him, and if there was anything on the place witness could use in serving Harry, to use it. Witness found the deceased lying, back down, on the ground. He told witness that he was going along

the road when the defendant told him that he could not pass him, defendant, any more, and that defendant then drew his pistol and fired, but missed him; that he, deceased, then fell over on the right side of his horse to escape the shots of the defendant, when the defendant fired again and struck him in the back; that he then fell to the ground, and the defendant fired the third shot, as he thought, at his horse. Deceased said that when defendant fired the first shot he thought the defendant's purpose was only to frighten him. Deceased was in his shirt sleeves, and asked witness to pull off his boots, which witness attempted, but desisted at deceased's request when he found he could not stand the pain. He then told the witness to cut them off. Witness having no knife, deceased told witness to take his, which after some trouble he secured, and cut the boots off. Deceased asked the witness to go after his mother. He said that his death was inevitable, and he wanted to see his mother before it happened. He also told witness that he told the defendant that he was not armed, and asked him not to shoot him. Witness knew both the deceased and the defendant well. The two were not friendly and did not speak to each other. Deceased had no arms about his person, nor did the witness see any about the place of the killing. The defendant, when witness approached him, asked if the party approaching was witness, and witness replied in the affirmative. He then told witness that he shot the deceased because the deceased ran his horse over him. Luther Smith was present. The deceased told the witness that he had no arms when he was shot; that he was passing the defendant when the defendant cursed, and said that deceased should not pass him any more, and fired before he, deceased, spoke at all.

Charles Cochran was the next witness for the State. He testified that he lived in Martindale, in Caldwell county, Texas. Witness, who was at the house of Doctor Taylor when the deceased was shot, heard the shooting. He went to the deceased shortly after Brooks returned to Doctor Taylor's, and found the deceased lying on his back, in the road, about two hundred and fifty yards from his home. He told the witness that he had been shot in the back for no cause whatever. He had on an overshirt, but no coat. Witness was present when he died.

W. A. Smith was the next witness for the State. He testified that he knew both the deceased and the defendant. He saw the deceased at Mr. Standifer's about an hour before he was shot, and next saw him about three quarters of an hour after he was shot, and saw him again at his father's house. He was mortally wounded,

but recognized the witness instantly on seeing him. He appeared to be rational. He told witness that he would inevitably die; that he was riding quietly along the road when the defendant shot him. Deceased died next morning about 5 o'clock. He was rational until about 12 o'clock, when his mind grew somewhat sluggish. The statement of the deceased was in the witness's handwriting, and was taken down about 10 o'clock at night. The justice of the peace asked the witness to write it for him. Witness had known the deceased since the deceased came to the county. He did not know whether or not the relations existing between deceased and defendant were friendly, but thought he had heard the deceased say that their relations were strained; that they had had some trifling difficulty before the shooting. Harry Taylor was killed in Bastrop county, Texas, on the 6th day of April, 1884. Deceased was suffering a great deal when he made the statement which witness reduced to writing, but was rational. His mind did not begin to wander until about 12 o'clock.

Here the State introduced the dying declaration of the deceased, which reads as follows:

"Testimony of Harry E. Taylor on his supposed death-bed, April 6, 1884.

"Walter Miles and I were not friends, and we had nothing to do with each other. On this evening I overtook him near where the said Miles lives. He said to me: 'I am going to kill you, you d—d son-of-a-b—h.' Then drawing his pistol he shot at me, and I fell over to one side of my horse and he missed me. He fired again and hit me in the back, and the ball came out on the side. I was riding along the road, coming to my father's house. I had no weapon of any kind with the exception of a pocket-knife, and it was broken. I did not speak to him until he, the said Miles, spoke to me in the above mentioned words. The said Miles's wife came to me. I asked her not to let her husband, Walter Miles, come back to me, for he would kill me and I wanted to see my mother before I died. I heard him, said Miles, tell his wife that if he knew he was not dead he would go back and finish him. He shot me in cold blood, for I begged him not to shoot me at all. I said to him: 'For God's sake don't shoot me.' "

To this statement was appended the certificate of the justice of the peace, certifying it to be the statement of the deceased on his death-bed.

James Childs was the next witness for the State. He testified that he saw the defendant in the upper edge of the county on the

day after the shooting of the deceased. He told the witness that he had killed the deceased, and the witness asked him why he did so. He replied: "Oh, d—n it, he rode by me in a boasting manner several times, but this time he found me out of humor. He ran his horse against mine and scared him, and that made me more angry, and I shot at him and missed him. He then leaned over on his horse as if to draw a Winchester, and I rode up and shot him. I think I know where I hit him. If he had any arms I did not see them, but I thought he was leaning over, trying to get a Winchester, at the time I shot."

Cross-examined, the witness testified that Mr. Adams was present during the conversation, and witness's brother came up soon after. Defendant said that when the deceased rode his horse against his, defendant's, horse, he made defendant's horse jump into the fence corner. He said also that if the deceased had any arms at the time of the shooting, no one would ever know it, as his friends would remove them. This conversation took place about six miles from Elgin, near Mr. Adams's pasture.

J. G. Henson was the next witness for the State. He testified that he saw and had a conversation with the defendant on the day of the shooting. He said that the deceased rode by him three or four times in a manner that indicated his purpose to run over him, and that he intended, if he did so again, to kill deceased. The deceased was at witness's house that evening. He had neither a Winchester nor a pistol at that time. Witness had never seen the deceased with a deadly weapon, and knew that he was not in the habit of carrying arms.

Cross-examined, the witness said that the deceased was at his house on that evening about an hour before sunset. Witness told him what the defendant had said, and deceased replied: "Well, if the d—d son-of-a-b—h can kill quicker than I can, let him kill." Deceased left witness's house about sundown. Witness did not think that the deceased was in the habit of going armed. He saw deceased with a six-shooter once, about six months before he was shot, on Blackburn's ranch in Travis county, which was about four miles distant from Elgin. He was, in the estimation of the witness, a peaceable and not a dangerous man. He lived on Blackburn's ranch when witness saw him with the six-shooter. He wore a waistcoat while at witness's house on the evening that he was shot. He had been to pasture some horses. To go from witness's house to Doctor Taylor's house, one would have to go through a lane fifteen feet wide, which passed by the defendant's house.

W. R. Scurry testified, for the State, that he had known the defendant since May, 1884. He first saw defendant at Plum Creek, Nebraska, and arrested him there for the murder of Harry Taylor. Witness was living at Red Rock in Bastrop county, where the killing occurred.

W. E. Jenkins testified, for the State, that he was the sheriff of Bastrop county. He heard of the killing of Taylor, and secured a warrant for the defendant's arrest. Witness went to Elgin to make the arrest, but did not find the defendant, who finally left the country. Much excitement prevailed at Elgin.

J. M. Taylor testified, for the State, that he was a brother to the deceased. The deceased and the defendant had a difficulty some seven or eight months prior to the shooting. Deceased on that occasion asked the defendant why he had killed his, deceased's, hogs. Defendant replied that he had killed the hogs and would kill the deceased, and told deceased not to speak to him again. They never spoke afterwards on meeting. The deceased did not own either a Winchester or a pistol at the time he was shot, and if he ever owned a Winchester witness did not know it. The State closed.

Frank Renneau was the first witness for the defense. He testified that he saw the deceased on April 4, 1884, a day or two before he was killed. Witness located the time with absolute accuracy from the fact that he, witness, accidentally shot himself on that day. He met the deceased in the lane spoken of by the witness Henson, and had a conversation with him about the defendant. Deceased had a pistol on, and said that he intended to kill Walter Miles if he ever got a chance, remarking in the same connection: "You will hear of one of us getting killed before Sunday." This conversation took place about one hundred yards from defendant's residence. Witness repeated this conversation to the defendant before the killing.

Cross-examined, the witness said that he lived on Big Sandy. He was in Elgin when he shot himself. He met deceased, when he had the conversation narrated, between his, Taylor's, home and that of the defendant. It was about 9 o'clock in the morning. Witness was certain that this meeting and conversation occurred on Friday, April 5, 1884.

Jack Bynum testified, for the defense, that he overtook the deceased on the road four or five days before he was killed, and rode with him until they came to the defendant's fence, when witness remarked that the defendant had a good fence. Deceased replied: "Yes, he is building a fence after killing my hogs,— the d—d cow-

ard." Witness asked: "Why don't you make him pay for them?" Deceased replied: "I will make him pay for them; I will kill him;" at the same time raising his vest and exhibiting a pistol to the witness. Witness went on to Elgin, where he saw and told defendant of these threats. Defendant remarked in reply: "I will defend myself."

Cross-examined, the witness said that when he found the defendant and told him of the conversation narrated, the defendant was in Elgin, and at the time was engaged in reading a newspaper. Witness was a well-digger at that time, and was then employed on Mr. Billingsley's well. When he met the deceased, the witness had been out to his father's, northeast of Elgin, to fix his well, and passed the defendant's house on his return. Deceased did not say when his hogs were killed. Witness did not see John Renneau that day. Witness was not subpœnaed to appear as a witness at the examining trial. Witness and deceased were perfectly friendly. Witness could not state the exact time the threats were made, but it was at least four or five days, and not more than one month, before the killing. Witness was at or near Elgin at the time of the *habeas corpus* trial.

George Carter testified, for the defense, that between four and six weeks before the homicide he met the deceased at a tank where they watered their horses. When the horse of the deceased started out of the water his vest caught on the saddle and exposed his pistol. Witness, laughingly and to tease him, told him that he was going to report him to Deputy Sheriff Linder. Deceased replied: "All right; you can tell him that almost every day, and if Walter Miles ever catches me without a pistol he will catch me without a shirt." He also told the witness that he had frightened the defendant's mules when they were hitched to his wagon, and tried to make them run away, and that defendant's wife and child were in the wagon at the time. Witness asked him if he was not afraid, at the time, of killing the lady and her child, and he replied that he would not have cared. Witness told defendant of deceased's threats. Once before this, when witness was sitting on the steps of Miles's saloon, in Elgin, with the defendant, he saw the deceased go to Biggs's store, some fifty yards distant. He stopped and spoke to some one, and then started towards Miles's saloon. By the time he reached the saloon his horse was going very fast, and his horse's legs struck the witness on the knee. Witness did not know whether the horse struck the defendant or not. Deceased stopped a short distance beyond the saloon and called witness, took witness through

Bennett's saloon, and asked him what the defendant had to say after he passed. Witness replied: "Not much, but you had better not run over us." Deceased replied: "Well, Walter Miles is a coward. I have run by him several times, and wanted to see what he would do; I am prepared for him, and if he ever finds me without a pistol he will find me without a shirt. I did not intend it as an insult to you, but only to Walter Miles."

Cross-examined, the witness stated that he lived in Elgin, but made a crop this year, 1884, on the Mrs. Miles and Doctor Sheasby place. Witness had known the defendant about four and the deceased about two years. He went to the tank, on the occasion mentioned, to water his horse. According to the best of his recollection, he had not then commenced work. Witness was present at the trial on *habeas corpus*, but was not called upon to testify. Witness was on friendly terms with the defendant, but had not been friendly with the deceased for some time, having had some trouble with him about a horse.

J. M. Humphries testified, for the defense, that on or about the 1st day of January, 1884, deceased came to his house and told him that the defendant came into his yard and killed some of his hogs. Witness told him in reply that he, witness, would kill any man who would serve him so. Deceased said: "It is none too late yet."

Claib Carter was the next witness for the defense. He testified that he was with the deceased on one occasion, about July, 1883, when he got witness's brother to survey some land for him. Deceased and witness acted as chain carriers. They encountered a pole-cat, when deceased drew an American bull-dog pistol from his pocket and fired at it. He afterwards, on the same day, shot at a rattle-snake with the same pistol. This was the only time witness ever saw him with a pistol.

Mrs. Kate Miles, wife of the defendant, was his next witness. She had cooked supper and was waiting in the door for her husband to come from the pasture when the killing occurred. Looking in that direction, she saw defendant coming towards the house in a slow walk, and the deceased coming up behind him, horseback, nearly at full speed. They were then about thirty yards from defendant's house. Deceased ran his horse up against the defendant, and against the shoulder of the defendant's horse. She heard the deceased say to defendant, at the same time: "G—d d—n you, Walter Miles, don't you draw that six-shooter or I will kill you." Witness saw none of the shots fired, but the shooting commenced about this time. When the witness got to the gate she saw her hus-

band go by on full speed, unable to stop his horse, which was almost frantic with fright, until he had passed the house over a hundred yards. Defendant then went into his house, got his Winchester and mounted his horse again. He afterwards told witness that he did not, at the time, know who it was coming up behind him. Defendant was carrying his six-shooter on that evening because of some recent trouble with another party about a horse, which party had threatened his life. The defendant told witness, just after the shooting, that when the deceased threw himself to the side of his horse he thought that he was trying to get his Winchester. The shooting occurred about dark, and the defendant started to Elgin immediately to surrender to 'Squire Poe. He, however, stayed at home on the night of the shooting, and, acting upon his father's advice, did not surrender, because of the excitement in Elgin. Defendant complained of pain in his leg that night, the result of the deceased's collision with him.

Luther Smith was the next witness for the defense. He testified that, a little after night on the day of the shooting, he and defendant took the horses to the pasture. Defendant, on their return, left witness at his, witness's, house, and went on home, about one hundred and fifty yards distant. Defendant, *en route*, appeared to be in a good humor, and was laughing and talking. In a few minutes the witness heard the shooting, but saw none of it, nor had he seen deceased on that day. When the shooting occurred defendant's wife called witness, and witness started to her house, meeting defendant's sister. He then saw the deceased lying in the lane, and went to him. Deceased told witness to pull off his boots, and then told him to desist. Witness then went back, meeting Brooks. Defendant told witness to go to deceased, and to do all he could for deceased. When Brooks came up the defendant said that he did not know who he was, nor what he might try to do. When Brooks came up, defendant threw up his gun like he was going to shoot, but witness called: "Don't shoot him, boss; that's Jimmie Brooks." Defendant then told Brooks to go to and serve the deceased if he could.

Jack Bynum testified, for the defense, that he had seen the deceased with a Winchester rifle, and had often taken care of his pistol at parties. Rufe Taylor also testified that he had often seen the deceased with a Winchester rifle attached to his saddle in a scabbard. He saw him once thus armed between Elgin and the tank. William P. Miles was dead. Ed. Barker, who lived at Mrs. Miles's, in Elgin, testified to the same fact; likewise did Tom Carter.

The defense next read in evidence the statement of W. P. Miles on the *habeas corpus* trial. It is as follows:

" I am the father of defendant. I was at my home in Elgin on the 6th of last April. On the night of that day I advised my son to go back home and go to bed, and on the morning of the 7th I advised him to leave on account of the excitement, and not to surrender."

Van Ziveley was the next witness for the defense. He testified that he had known the deceased about four years at the time of his death. On January 20, 1881, witness had a difficulty with the defendant, when Harry Taylor, John Tisdale and others offered to help witness fight the defendant. Doc Christian and Ally Tisdale were with the deceased at the time. All of the talking at the time was done in the presence of the deceased. Some of the parties named were armed with Winchester rifles, but witness did not remember whether or not the deceased was armed. He, however, was acting with the other parties.

Frank Coker testified, for the defense, that when, on one night in the year 1881, he and the defendant were going up to bed, some one shot into the house, striking witness in the back of the head, from which wound the witness was confined to his bed for a month. Witness had no enemies, and at the time thought that the shot was fired at the defendant. Several other shots were fired at the same time, one of which struck very near the defendant. Defendant had a very narrow escape. The defense closed.

John S. Smith was then introduced by the State. He testified that the deceased was at his house on the Saturday before he was shot, when witness employed him to gather cattle. He was again at the house on the next day, Sunday. On Monday he went to Blackburn's pasture. On Tuesday he commenced to gather cattle. On Wednesday he herded cattle on the prairie, and on Thursday, before he was killed, April 3, 1884, about 10 o'clock, he and witness started to deliver the cattle on the other side of Taylor in Williamson county. Witness's son, John Childs, and Jim Litton were along on the 3d of April. They stayed with the cattle that night at Lawrence's stock pens, about seven miles north of Elgin, and left next morning, April 4, and drove to Taylor on that day. Deceased was with witness all of the days of April 3d and 4th, leaving witness on Saturday morning, where the cattle were delivered near Taylor, saying that he was going to Georgetown, ten miles distant. Witness saw him no more until 11 o'clock on the night of April 6, which was after he was shot. If deceased had any arms with him

on the trip to Taylor, the witness did not see them, and they must have been very closely concealed. Deceased, during the drive, was in his shirt sleeves. Witness had never seen the deceased with weapons, and knew that he was not in the habit of going armed. Deceased and the Tisdale boys were intimately associated. It was possible for deceased to have had a pistol without witness seeing it.

John Childs testified, for the State, that on Thursday before the shooting, he met the deceased about one and a half miles from Doctor Taylor's house, and helped him and the Smiths drive some cattle about four miles towards Williamson county. Witness had no recollection of ever seeing deceased with a gun, but had seen him with a pistol.

Hiram Smith testified that on Thursday and succeeding days to it, April 3d, 4th and 5th, deceased was with witness and his father, driving cattle from Elgin to Taylor.

McB. Townsend testified that he lived on Blackburn's ranch in Travis county, four miles from Elgin. Deceased was in witness's employ from November until his death in April. Witness had never seen him with a gun or pistol, and knew that he did not usually carry either.

R. V. Standifer testified, for the State, that the deceased was at his house on the evening of the shooting, and went from there to the pasture, to do which he would necessarily pass defendant's house. The witness saw no arms about his person. Deceased rode witness's horse, a fast, quick-moving pacer, but not very skittish. Deceased had no Winchester with him that evening.

John Shields, recalled for the State, testified that it was some eight or ten months prior to the shooting that he saw the deceased with a pistol. Witness had borrowed this pistol from deceased, and deceased came and got it. He afterwards traded it to a man named Smith. Witness and deceased worked together on the same range and were very often together. Witness never saw deceased with the pistol but the one time. James Litton testified that he often saw the deceased on the range, but never saw him with a pistol.

The motion for new trial raised the questions discussed in the opinion.

*G. W. Jones, J. D. Sayers* and *J. P. Fowler*, for the appellant, filed an able brief and argument.

*B. D. Orgain*, for the State.

*J. H. Burts*, Assistant Attorney-General, for the State. Many errors are assigned to the charge of the court, and none to any other proceeding. Hence the investigation on appeal will be confined to an examination of the charge with a view of ascertaining its applicability to the evidence, and this, in the absence of exceptions thereto taken at the time of the trial, with the further view of ascertaining if, as a whole, it is erroneous to the extent of materially injuring the legal rights of appellant. (Code Crim. Proc., art. 685; Clark's Criminal Law, p. 522, note 208; *Mason* v. *The State*, 15 Texas Ct. App., 534.)

"The charge must be considered as a whole, and isolated paragraphs ought not to be selected and pointed out with a view to showing error." (Clark's Criminal Law, p. 515, note 204; *Hudson* v. *The State*, 10 Texas Ct. App., 215; *Brownlee* v. *The State*, 13 Texas Ct. App., 255.)

It will be observed that by the assignment of errors in this cause the charge is attacked, not as a whole, but in detached portions, paragraphs and parts of paragraphs, and even isolated phrases occurring in paragraphs, not in themselves liable to grave misconstruction or calculated seriously to mislead jurors trying the case, who must be presumed to have been men of some degree of intelligence, and not idiots incapable of understanding common language.

The third and fourth assignments of error are to the effect that the court erred in not plainly and sufficiently defining the expression "adequate cause" and the word "passion." Keeping in view the facts of the case, these assignments are untenable. Objections to the charge were for the first time presented and urged in the defendant's motion for a new trial, and after he had achieved a decided victory over the prosecution by getting from the jury a verdict of guilty of murder in the second degree, instead of murder in the first degree, which the evidence would have supported. The charge, when taken and construed as a whole, is a full, fair and correct exposition and application of the law of the case. That it did not define "adequate cause" (and passion), in instructing upon the law of manslaughter, would be an objection which, under some circumstances, would be a valid one, *if excepted to in time*, or in some cases, perhaps, without exceptions being taken. But in this case we find no such state of facts as imperatively demanded a specific explanation of "adequate cause" (or passion). There is but slight evidence of "adequate cause," and the court applied the law to this in stronger terms than it could have done by a simple definition of adequate cause and passion, in that it charged the jury that "if

the killing was provoked by Harry Taylor riding against the defendant, or attempting thereto, if such provocation was in fact the cause, and if it did then and there so influence the mind of this defendant as to prevent it from exercising cool reflection, then the offense would be manslaughter." Under this instruction the jury could not have been mistaken or misled as to the meaning of "adequate cause" and passion, and certainly appellant has no reason to complain at the substitution of this paragraph of the charge for the definitions; and, as already seen, the complaint comes too late. (*Mason* v. *The State*, 15 Texas Ct. App., 550.)

Hurt, Judge. Appellant, Walter H. Miles, was tried and convicted for the murder of Harry Taylor. The jury found him guilty of murder of the second degree, and assessed his punishment at confinement in the penitentiary for a term of twenty-five years. From this conviction and the judgment rendered thereon Miles appeals to this court, and assigns numerous errors. We will discuss but three of the errors assigned.

Very clearly from the statement of facts it was the duty of the learned judge trying the case to submit to the jury the law applicable to murder of the first degree, murder of the second degree, manslaughter, and self-defense. And so viewing the case, the learned judge did instruct the jury upon each degree, and also upon self-defense. As the jury acquitted defendant of murder of the first degree, we deem it unnecessary to make any observations upon the charge of the court relative to express malice or murder of this degree.

The court charged the jury upon murder of the second degree as follows: "Every rash and inconsiderate killing under some sudden impulse, wherein there is no sedate mind and formed design to kill, is murder in the second degree. The law implies the malice. Every voluntary killing of a human being is murder in the second degree, unless the circumstances attending it upon one hand show express malice, which would then be murder in the first degree, or, upon the other, such as would reduce the offense to manslaughter, or which would excuse or justify the homicide."

The first paragraph of this charge is evidently erroneous; yea, radically incorrect. For it is not true that any rash and inconsiderate killing under some sudden impulse, wherein there is no sedate mind and formed design to kill, is murder in the second degree. Nor does the law in such a killing imply malice. For the killing may be upon a sudden impulse, and the act rash and inconsiderate,

and still the impulse may have been produced by adequate cause, and the passion so aroused as to render the act rash and inconsiderate.

And again: if there be adequate cause to arouse the passion, and upon a sudden impulse a party rashly and inconsiderately kills, he would be guilty, not of murder but manslaughter. This charge takes from its legitimate location, and forces murder of the second degree within the boundary of manslaughter. But it is urged by the assistant attorney-general that the next paragraph so qualifies this objectionable charge as to render it harmless. While it is conceded that the second paragraph is a correct enunciation of the law, we are not by any means satisfied that it was understood by the jury as being a qualification or modification of the first paragraph.

In the first, a rash and inconsiderate killing is spoken of; in the second, voluntary killing is the subject-matter of the charge. Now may not the jury have understood and believed that these were different characters of killings or homicides, and that, if the killing was upon a sudden impulse, and was rash and inconsiderate, without qualification, such killing would be murder; and that circum-stances of reduction or justification applied to and qualified alone a *voluntary killing.* We are of the opinion that the first paragraph was such error as was calculated to injure the rights of the defendant.

Upon the subject of manslaughter, the court charged as follows: "If the killing was provoked by Harry Taylor riding against the defendant, or attempting thereto, if such provocation was in fact the cause, and if it did then and there so inflame the mind of this defendant as to prevent it from exercising cool reflection, then the offense would be manslaughter."

Counsel for the appellant object to this charge because, they say, the jury are restricted in the consideration of the question as to whether the killing was *only* because the deceased rode his horse against the defendant, or attempted to do so; that, in considering the adequacy of the cause to produce the passion, and the effect of such passion upon the mind of the defendant, by the charge the jury are limited to the act of riding or attempting to ride the horse against the defendant. Counsel contend, and we think justly, that in passing upon the sufficiency of the cause to arouse the passion, and the degree to which the passion was aroused, that is, was the mind incapable of cool reflection, the jury, instead of being restricted, in their investigation of these questions, to what occurred at the time of the homicide, should have been instructed to look to all the facts in the case, in passing upon these questions.

In *Biggs* v. *The State*, 29 Ga., 723, Parish, the party shot, on the night before the shooting had attempted the seduction of the wife of Biggs, under circumstances of gross and direct aggravation. On the next morning he seated himself in the immediate neighborhood of Mrs. Biggs at the breakfast-table, whereupon Biggs shot him. The trial court charged the jury upon this matter,—" That, whatever may have occurred on the night previous to the difficulty at the breakfast-table, it could not amount to a justification or excuse for the act of shooting, the morning after the difficulty." Upon this charge, Judge Lumpkin makes these observations: . . . " and this instruction was based, no doubt, upon the idea that sufficient time had elapsed for reason to resume her sway. In many cases this doctrine is true, but we cannot think it a sound proposition under the facts and circumstances which surrounded these parties. The husband had heard and seen the personal indignity offered his wife the night before. He permitted Parish to escape, with threats of punishment should he remain in the city. The very next morning, at the breakfast-table, he unblushingly resumes his seat in the immediate neighborhood of his intended victim. Was it human to keep cool in such a situation? To see the man who had attempted to desecrate the famly altar, the night before, seat himself within two chairs of his wife! And was it not right and proper, in order to account for his violence, to give in proof to the jury the occurrences of the preceding evening? To shut out the scene which transpired in the bed-chamber is to deprive the jury of the power of appreciating the transport of passion kindled in the bosom of Biggs by the presence of Parish."

Now, while it is true that the provocation must arise at the time of the commission of the offense, and the passion must not be the result of a former provocation, yet in passing upon the sufficiency of the provocation, and on the effects of the passion upon the mind of the defendant, the past conduct of the deceased toward defendant, his threats and bearing, in fact all the facts and circumstances in the case, should be considered by the jury. An act standing alone may not be a sufficient provocation, but may be ample when it is one of a series of similar acts, or when it has been preceded by an insolent and aggravating course of conduct, whether similar or not to the act committed at the time of the homicide.

We are of the opinion that the charge of the court was too restrictive upon the subject, and that the attention of the jury should have been directed to all the facts of the case; not by the special enumeration of each, but they should have been told that, in pass-

ing upon the sufficiency of the provocation, and the effects of the passion upon the mind of the defendant, they must look to all the facts in the case.

That part of the charge of the court relating to self-defense under threats is as follows: " If Harry Taylor did threaten to kill this defendant, and if at the time of the killing Harry Taylor did make such a demonstration as to induce the defendant to believe he did then intend to execute such threat, then this defendant would be justifiable in taking the life of said Taylor; and if you so believe you should acquit." This charge is qualified as follows: " Or, if the defendant did shoot at Harry Taylor before the latter made any effort or demonstration to execute such threats, then there would be no justification if even Harry Taylor did subsequently manifest any such intention."

The law upon this subject is that, to justify under threats, " it must be shown that at the time of the homicide the person killed, by some act then done, manifested an intention to execute the threats." In the qualification above cited the learned judge departs from the statute, and for "some act manifesting an intention to execute the threats," he substitutes " made any effort or demonstration." Now, whether he intended to qualify effort by demonstration, or demonstration by effort, we know not. Demonstration has several meanings. The first given by Mr. Webster was certainly not intended by the learned judge. The second is in harmony with the meaning given by our courts to " manifest." It is, "an expression of the feeling by outward signs; a manifestation; a show." "Effort " means "an exertion of strength; strenuous endeavors; laborious attempts; struggle directed to the accomplishment of an object; exertion, as an attempt to scale a wall; an effort to excel." (Webster's Unabridged Dictionary.) There is no word in the English language, we think, better understood by the people generally than " effort." And when told that an effort must have been made to execute the threats, the jury doubtless understood the court to mean an attempt. This means something more than a demonstration or an act manifesting an intention. It means an actual attempt to execute the threats. And, as the threats were to take the life of the defendant, an effort means an attempt to kill defendant.

Now, if there was an effort to take the life of defendant before he shot, he could stand upon this fact, without threats. The threats are of no value or benefit to him, for his right of self-defense was complete without them. We are not treating of a case of mutual combat, or a case in which the defendant provoked the difficulty.

We are of the opinion that this charge was calculated to confuse and mislead the jury, to the prejudice of the defendant. For the errors in the charge of the court, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered May 6, 1885.]